Here, the case of Chevron v. Page. Mr. Terrell, whenever you're ready, we'll hear from you. May it please the Court, my name is James Terrell. I am a member of the firm of Patton Boggs, and I represent today the appellants, the Ecuadorian plaintiffs. Before the Court today are two consolidated appeals. The first is an appeal from a subpoena, directing an attorney to produce documents and finding a wholesale waiver of privilege. The first one, this would be related to the RICO proceeding that just concluded in New York? Correct, Your Honor, and that's docket 1382. So, in that case, before we would look at the merits, if we did, we would need to ascertain our jurisdiction, whether that we have jurisdiction to hear the appeal. And in this case, as I understand it, your client, Mr. Page, are non-parties to the underlying out-of-circuit proceeding in New York, which would make this an ancillary proceeding regarding the granting of discovery. I was under the impression, perhaps wrongly, that the general rule is that there would not be jurisdiction, appellate jurisdiction, for an appeal by the non-party to be heard until the non-party is subject to a contempt requirement for having disobeyed a discovery order. So, tell us why we have jurisdiction in this first case. Your Honor, let me respond with three points. First, I represent the Ecuadorian plaintiffs. I do not represent the individuals Mr. and Mrs. Page. But that's just by way of clarification. Let me ask you on that, then, was the subpoena issued to you? The subpoena was issued to the Pages My clients appeared as interested parties in the proceeding. I understand, but the Pages are the persons aggrieved, right? They received the subpoenas, and as Judge Agee pointed out, this is an ancillary proceeding with respect to the subpoena, right? Your Honor, the parties aggrieved are the parties that own the privilege. The parties that own the privilege are the Pages' clients. Those are the people I am representing here. You people, you represent the people that have the attorney-client privilege. Correct. Do you have the work-product privilege? We believe we have the work-product privilege as well, yes, Your Honor. So, you're claiming both privileges, and you're bringing the appeal, the first appeal, which relates to the proceeding in New York. That's correct, Your Honor. And if I can go back to Judge Agee's question. The thing that's not right about what Your Honor said is that there were two separate proceedings in New York. The subpoena issued out of a proceeding in New York that is now dead. Why? Judge Tribe, the word of 0691 case. That's what it was captioned as, and obviously, you issue a subpoena in connection with an underlying proceeding. Correct, Your Honor. The subpoena was issued in the case of 0691 in New York. And at the time, 0691, that the subpoena was issued, Judge Kaplan, on April the 13th, 2011, severed the cases. I understand. The docket number was never changed on that subpoena, but no subpoena could have issued at that time because Judge Kaplan had issued a stay order. Well, he could have violated it, but it's still issued in that case. Whatever case was 0691, this subpoena's attached to. And I don't know how you can get by that because that's the power invoked under the rule. The rule requires you to get a subpoena in blank, to issue the names of the parties, the case number, and where it's pending. Your Honor, at the time the subpoena issued, it should not have borne that docket number. No, it did. And that's the power of the court, and it was not an illegal subpoena. No, Your Honor, it was not an illegal subpoena, but it was a subpoena that at the time it was issued in the so-called declaratory judgment count nine docket. That was the only docket that was open that would have supported issuance of a subpoena in another district. That docket in which that subpoena was ordered, ALT was the preliminary injunction case which the Second Circuit reversed in its entirety and ordered dismissed. Well, let me just stick for a moment with my assumption that it's in the RICO case and ask you a little along the same lines. Judge Kaplan did issue a final judgment, I gather, a couple of weeks ago. He did, Your Honor. With a lengthy opinion. Yes. How are we to take that? It does not affect the decision before you, Your Honor, today. It does not cure the failures committed respectfully by Magistrate Judge Day or by Judge Titus. You can't go back and say the failure of the court, when I get to the merits arguments, to make the findings necessary to determine waiver, wholesale waiver of attorney-client privilege. Well, I was going a little more on your procedural point. My question was focused a little more on the mootness issue. The RICO case, the Salazar case, which is the other breakout case, Count 9, is dead. It's over. It's over. The RICO case was resolved by a final judgment on March 4. Correct. And the question is, is this subpoena moot if it's attached to that case? Your Honor, let's assume for the moment it was moot. I don't think it is. Chevron certainly does not believe it is. Well, they'll get up here and say it's subject to appeal, and there may be open, and until it's final, in its final sense. But it doesn't matter. Because the exact same request was made in the 1782 proceeding, and the 1782 proceeding is not moot. It is in support of a foreign proceeding currently pending before the Hague, a bid arbitration. And that's the case that's consolidated with it. The case that's consolidated. It is the same issue, you say? Exactly the same issue, Your Honor. And that's why I don't want to not get bogged down. But you're saying it's a jurisdictional issue in the first case. Right. Really doesn't make any difference? Correct. Well, why don't you get the merits, then? You don't want to lose all your time on these procedural niceties. No, Your Honor. Let me turn to... Well, should all this be stayed pending the resolution of the appeal in New York? I don't think Chevron will want it stayed, because it wants the documents in support of the international proceeding. I mean, you could say you want it stayed, I guess. No, Your Honor. The correct disposition here is reversal and remand. It is not... It should not... Where are the documents now? The documents are in the hands of Chevron, though they were ordered by Judge Titus to be returned. But they've been turned over. Completely. Under compulsion. So they have what your clients say are the privileged documents. They have had access of the attorney-client privileged materials during all this time. Correct. Do they have all the documents? Yes, Your Honor. What about email? I believe they have everything, Your Honor. So what, is the cat out of the bag? I mean, what would... If you win, they have to turn it back over and purge themselves of whatever they saw? That's what the Supreme Court says, which is to do the best you can to cure the fact that it shouldn't have been turned over in the first place. But let me hustle to the merits. Before we leave the procedural niceties, back to the jurisdictional question on the RICO case. Tell us again how you would say a case like Mike's Train House doesn't settle the jurisdictional question here. What we believe with respect to the jurisdictional question here, Honor, is that it falls within the purview as an order to lawyers under this court's decision in Potomac Electric Power v. Levitt that it is a subpoena served on a non-party, in this case a lawyer, who cannot be expected to stand up and be held in contempt. Is that the Perlman Doctrine? I'm sorry? Is that the Perlman Doctrine? Yes, Your Honor. You're claiming jurisdiction under the Perlman Doctrine? We are. On the other hand... Which is 1918 or something by the Supreme Court of the United States. Almost as old as the courthouse, Your Honor, but yes. And its subsequent project... But some of these people say that Mohawk undercut it. Yes, Your Honor. And I want to stick with procedure because the court wants me to, but we've got to consider the same issues under 1782, so it doesn't matter. It just doesn't matter, okay? If the decision... We have to reach the merits at least under one of the petitions and it's the same issue. But the jurisdictional issue wouldn't necessarily be the same under the 1782. No. The finality under the 1782 is undisputed throughout the circuits. It is a proceeding the only purpose of which is discovery, and once discovery then takes place, it is appealable. I've handled... I've been privileged for the Ecuadorians to handle this in multiple circuits, and that's been the uniform rule. The issue that Your Honor raises is appropriate with respect to, if it stood alone, the subpoena directed to attorneys. We believe that there is finality, but in either event, the three merits arguments I would like to make probably need to be considered. With your permission, I'll turn to the merits arguments. No. 1. The district court erred in concluding that the forfeiture of the privilege ruling made by Judge Kaplan in the Southern District extended to Mr. Page. Judge Day himself concluded that there was no voluntary waiver in the Southern District, that the waiver of privilege of 17 years of attorney-client documents was done as a forfeiture, was done as a punishment because of Mr. Donziger's failure to submit a privilege at exactly the same time he moved to quash the subpoena. And the court then went on to say that it nonetheless was going to extend that waiver, that forfeiture by Mr. Donziger, to an independent set of lawyers, to a group of lawyers who acknowledged worked with Mr. Donziger. That's not what the law is. And with respect... I thought the court made a finding there, not the Maryland court, but the New York court, that Mr. Donziger in that instance made a deliberate tactical decision for delay for his purposes, and that that's why the waiver came about. The court decided in New York that there was a decision, as Your Honor described, but the forfeiture was still not voluntary. He didn't choose to waive the document. The court concluded he made that tactical decision in the case, whether rightly or wrongly. The Second Circuit severely questioned this and said Judge Kaplan should go back with a draconian sanction like that if the emergent need of two people being accused of criminal violations in Ecuador went away, and it did go away. And Judge Kaplan issued an opinion to the Second Circuit and said, I'm willing to reconsider it. But then when it went back to Judge Kaplan, he said no, he would not reconsider it. Does a lawyer have a right to waive attorney-client privilege, the privilege of his client? Can a lawyer waive it? Can a lawyer waive the attorney-client privilege? With the consent of the client, yes. Well, but can a lawyer waive it? I think it's possible that he could waive it, yes, Your Honor. Without the consent of his client. I believe that that's probably possible, but that's not what happened here. They were ordered to produce. And that's what Judge Day, in his own opinion, said. They were ordered to produce. And we cited, I won't. So you're saying they were produced under compulsion? Compulsion. And that doesn't constitute a waiver? Correct. Watching my time. My second merits argument, Your Honor, is that notwithstanding the issue of whether there is a forfeiture, the analysis performed by the court on crime fraud was completely wrong. In the first instance, there's two prongs. One, is there a prima facie showing of crime fraud? If you look at Judge Day's opinion, and of course, the opinion by Judge Titus was one-page affirmance, essentially. Judge Day's opinion relied virtually entirely on Judge Francis' opinion, which relied on Judge Kaplan's opinion, which opinion was completely reversed by the Second Circuit. What did the D.C. Circuit do with it? The D.C. Circuit, in light of that, Your Honor is correct, if I can just turn to that. You were in that case, too, weren't you? I was. And the D.C. Circuit, on the basis of that, said it had to be reversed and remanded. The exact language from the D.C. Circuit said, given that the District Court relied on the decision of the New York District Court, and that the New York District Court's decision was subsequently reversed by the Second Circuit, we must vacate the D.C. District Court's decision and remand, which is precisely the relief we are asking for here. They did it all one page, didn't they? They did it all, they brought a one-page opinion. It was a short opinion, yes, I'm not sure how long it was. Judge Kavanaugh. Yes. Unanimous opinion. Yes. What happened after that? It went back to the court. I did not handle it below, and I'm not sure if it was resolved by agreement. Is there any way to distinguish that case from this one? I don't believe so, Your Honor. And if I can go to the second prong, because the Third Circuit, where I argued, dealt with this, and I suggest the second prong, that this court should follow the Third Circuit's lead on that. The Third Circuit said, you know, two things have to be done here. You've got to look at the documents. Judge Day did not look at the documents. He basically ruled en masse that there was a waiver of privilege. The Third Circuit, in addressing that same question, said, we therefore will vacate the District Court's determination with respect to the crime fraud exception to the attorney-client privilege, and will remand the case to the District Court so that it can conduct an in-camera review of the relevant documents and determine whether the crime fraud exception to the attorney-client privilege is applicable to any of the documents, and if so, which ones. And you know what happened? This is not a case where anything's being hidden. They have the documents already. This is a case in which Chevron is essentially looking to score another win, to basically say, you know, this happened in the District of Maryland, and the Fourth Circuit approved it, which is why we've been forced to fight in every circuit, and every circuit we've fought in has reversed this when it has happened on this basis. How many circuits reversed it? The Third Circuit, I think twice. The D.C. Circuit, and I don't remember. I wasn't in the Fifth Circuit case, so I'm not entirely sure what happened. But we were in 17 District Courts, Your Honor, in all of this. So it's been quite a round. I've made the point, and you can bear with me. Let me ask you something you said earlier. I'm curious about the rights involved with respect to the work-product privilege. Yes, sir. This is a hypothetical. If an attorney engages in fraud on the court, and does memoranda, engages in correspondence among other attorneys, and they're carrying out the scheme to defraud the court, is that a privilege that belongs to the client? Or in that case, can the attorney waive it? I'm not sure of the answer, but I think the attorney can waive it, but not without the court looking at the document and concluding that the document in question was in furtherance of the fraud. It goes to my very early question about the role. I'm very aware, of course, in the attorney-client privilege, it belongs to the client. I mean, as a matter of fact, attorneys don't have a lot of say about it. There's an imputed knowledge from the attorney to the client. But with respect to the work-product privilege, it seems to me what Chevron, and at least what Judge Kaplan have concluded, is that this was a comprehensive effort that was being designed and orchestrated by these attorneys to bypass legitimacy in Ecuador. And virtually all of their efforts should be exposed under this exception of participating in fraud. Is there an easy answer to that? I don't, we'll see what the Second Circuit says in about a year, Your Honor, but no, I don't think there is an easy answer to that. That's clearly what Judge Kaplan has concluded. But, if I may, Chevron asked for this case, which started in New York, to go to Ecuador. Three Ecuadorian courts concluded there was no fraud. Now, Judge Kaplan has said that the judge who made the initial decision was bought. But then, under Ecuadorian procedure, it went up to an intermediate appellate court in Ecuador on de novo review. And they concluded that there was no fraud. Then it went up to the Ecuadorian Supreme Court, and it was affirmed. You know how Judge Kaplan dealt with that? Judge Kaplan indicted the entire Ecuadorian judiciary. And he said, you can't believe or go with anything that they said. Even though that was Chevron's- There are a couple reasons why Judge Kaplan said it, and pretty good reasons. I mean, first of all, Ecuador is going to get billions of dollars out of this. All of Ecuador. That's number one. And number two, there is some evidence that something very, very wrong took place. I mean, you see the video, and you see Cabrera sitting in the same room with the attorneys, working on a strategy, and then you see this memo, these memos that were done by the pages that were never turned over to the court, and the language appearing in the court's opinions. There's stuff that maybe your clients are fine, but at this point, it doesn't look very good. And so Judge Day was acting on that more comprehensive notion than saying, oh, we have a particularized document that says there's a fraud. He's concluding that the effort was a fraudulent effort to bribe judges. But he based that not on what Judge Kaplan found a week ago. This goes back two years. He based it on an opinion, another 171-page opinion by Judge Kaplan, concluding mostly the same thing, completely vacated by the Second Circuit. And so all we're saying is, as a matter of procedure here, these decisions in this court were wrong. The other circuits have concluded that the same thing by their district courts were wrong. You know what's going to happen if you remand this? Chevron has the specific documents. Let them come forward, as was done when the remand occurred in the Third Circuit, and say, Mr. Terrell, we only care about two of the documents. We may waive the privilege, and the whole issue will go away. We waived it in the Third Circuit. Several hundred, I'm not sure exactly. Is that a roomful? No, no, no, no. It's much more. Several hundred, that's all? Counsel can tell, but it's not a lot of documents. Are they satisfied you produced everything? I think that they've made a further motion with respect to that, that they've tried to make in this docket, I think perhaps to suggest that by creating new activity in the case, there's no appellate jurisdiction. But in any event, that still sits, and has not gone anywhere in the court. Okay. We'll have you back up. Thank you very much, Your Honor. Appreciate it. I mean, you're getting used to this, aren't you? Your Honor, I think I'm ready to retire from this. I'm an old defense lawyer who has had his very first crack at being involved on the plaintiff's side of the case, because a corporate client asked me to do so. And as I reflect on it, I think I better stay on the defense side of the case. Thank you. Thank you, Mr. Tyrell. All right, Mr. Frey. Good morning. May it please the Court? My name is Tom Dupree. I'm here this morning on behalf of Chevron. So tell us first off whether you agree or disagree with Mr. Tyrell with regard to the jurisdictional issue in the RICO case. I disagree with him, Judge Agee. You disagree? That is correct. Our position is that there is no valid jurisdiction over the RICO appeal. We think there is as to the 1782 appeal, but as to the RICO appeal, no. And here's why. Mr. Tyrell is attempting to fit this case within the narrow confines of the Perlman doctrine. Did we ask you for supplemental briefs on this jurisdictional point? I don't think you even mentioned Perlman in your supplemental brief. We did not mention Perlman in our supplemental brief, Your Honor. That's sort of what we were looking for. How does it fit or not fit under Perlman? Well, keep in mind... You didn't even mention. The plaintiffs had never identified Perlman as a basis for jurisdiction prior... Well, when a lawyer or the clients appeal this kind of thing, Perlman just jumps out. Well, let me... And again, Your Honor, let me just... Responding to Judge Agee's question as to Perlman, the reason why we don't think Perlman applies, several reasons. Number one is that Perlman applies when you have an instance of a disinterested third-party witness. In Perlman, of course, the disinterested third-party witness was a court clerk who obviously had no dog in the fight and was willing simply to submit and turn over the documents. That's why the Supreme Court permitted an interlocutory appeal. Here, Mr. Page, in sharp contrast, is anything but disinterested. In fact, he's been fighting us tooth and nail in the district court. He's fighting us here on appeal. He is far removed from the disinterested court clerk that was at issue in Perlman. So for that reason, we don't think there's appellate jurisdiction. The Second Circuit, in another appeal arising from one of Mr. Donziger's associates, who was subject to a third-party discovery order, filed an appeal. And the Second Circuit dismissed that case, finding that Perlman did not apply and that there's no appellate jurisdiction. Mr. Tyrell says he's not here on behalf of Page. He's here on behalf of the Ecuadorian plaintiffs, who are, I think, in the RICO case in New York. Is that right? That's right. That is correct. Although, I don't... He's representing the Lago Agrio plaintiffs today. He's not representing Mr. Page today, although he's presenting argument on his behalf. But he's representing the clients. They're the holders of the privilege. In theory, that's... The attorney-client privilege is owned by the client, I always thought. I practiced law for a long time. And I understood, always, that the attorney-client privilege belonged to the client. Not to the lawyer. Now, the work product privilege is a different bird. It belongs a lot to the lawyer. But, I thought that he was up here arguing for the clients. Trying to protect the attorney-client privilege against things that you already have. It's an odd situation. That you get it from a failure of the lawyer to file a piece of paper in a courthouse. You get everything that belongs... The privilege stuff that belongs to the client. The impact of this on criminal proceedings is scary. Well, Judge King, I respectfully disagree with your Honor's characterization. This kind of a ruling that you seek is absolutely terrifying to the fundamental concepts of litigation, as far as I'm concerned. Particularly criminal litigation. I mean, I've had criminal clients that I've talked to who've inculpated themselves. And under your principles, if I don't file a privilege long-timely the other side, or the government, or the prosecutors get access to my notes. Judge King, I... That's what my client told me. And I've got to get on the witness stand and testify against him. Yeah, he confessed. Well, I respectfully disagree with your Honor's characterization on a number of fronts. One is, I hope the Court will keep in mind that the question as to whether this was an appropriate privilege waiver was appealed to the Second Circuit. Which unanimously affirmed Judge Kaplan's ruling and, in fact, concluded the opinion by singling out Judge Kaplan for praise in his handling of this matter. So, your Honor's question about how the consequences are draconian was fully vetted before the Second Circuit which affirmed Judge Kaplan's privilege. I thought you'd say there's a difference between criminal proceedings and civil proceedings. That was going to be my second point. And my third point... Attorney-client privilege and work product privilege which aren't most of the documents work product in this case? Yes, I think that's fair to say. But you've never identified which are which. All you've talked about is privilege. You've used the term privilege. Privilege. Privilege. Privileges. Privileges. Not which, whether it's attorney-client or work product. You just use them interchangeably. Well, that's because Judge Kaplan found that any privilege or work product protection was waived as a result of Mr. Donziger's obstructionist... Attorney-client privilege was waived by the failure of the lawyer to file a log in a timely manner under a local rule gave up the privilege of all of his clients as attorney-client privilege which belongs to the client under the general concepts of privilege law. Judge King, that ruling was affirmed by the Second Circuit. But the other point I would make is it's more than simply a failure to file a timely privilege log as though something that could happen out of inadvertence. This was a calculated, intentional, obstructionist effort to delay and to stonewall. And if the lawyer does that, maybe he ought to be disbarred or something. You can take sanctions against lawyers, but still the attorney-client privilege things that clients say to lawyers are protected. Advice that lawyers give clients are protected. And it's sacrosanct. In a lot of jurisdictions it's a felony for a lawyer to give it up. But I think the law is fairly well settled that a lawyer can waive the attorney-client privilege, especially when you have a situation here where the lawyer was not making a good faith... Without the consent of the client. That's correct. Yes, I would point out that Judge Kaplan, of course, specifically found that the clients had ratified their attorney's actions. So I would question Your Honor's... Did the Second Circuit conclude that? What did the Second Circuit conclude on the waiver? The Second Circuit affirmed the waiver, and they said that Judge Kaplan acted appropriately in deeming Mr. Donziger's calculated tactical obstructionist effort as a bad faith effort to delay our efforts at discovery, and that the sanction was fully appropriate. You're saying Judge... Well, that's not what Judge Kavanaugh says in his opinion. Said the Second Circuit reversed it. Well, I think, Your Honor, Judge Kavanaugh... Kavanaugh misunderstood? We're talking about two different opinions, Your Honor. Oh, we are? We are. Oh, two different... Well, Mr. Terrell says it's the same case as it was up in the D.C. Circuit and that in that case, Judge Kavanaugh says that the Second Circuit reversed the ruling that was relied upon. Well, that's true as far as it goes. Here's the issue. Did you think that case in the Supreme Court was denied, or were they all doing... We didn't... That case went back to the District Court, but let me just quickly respond. If we ruled in your favor, it sounds to me like he's right. We'd be creating a split in the circuit. That's not right. He's wrong when he says it's the same case. Well, it's the same case. There are different rulings flowing out of the same dispute. He says the Third Circuit's agreed with him, too. Well, let me first... Let me address the D.C. Circuit. On the D.C. Circuit side, Judge Kavanaugh didn't opine on the Second Circuit's waiver ruling. He didn't opine on it. He just primarily said it was reversed. There's a different Second Circuit ruling that provided the basis for Judge Kaplan's opinion. That was the Naranjo case, which concerned a procedural availability of declaratory relief under the New York Judgment Recognition Act. That is something completely separate from the Second Circuit ruling we're talking about today, which is their affirmance of Judge Kaplan on the waiver finding. If I could turn to one critical... Why is that the law of the case? In other words, this subpoena issued out of the one where they found the waiver. Isn't that the law of the case in an ancillary jurisdiction? We just have to... We're bound by it? I think that's right, to the extent that the Second Circuit has said that this is a proper sanction in this context. And that's my point about emphasizing the fact that the Second Circuit had affirmed this. It's the same case. It's not a collateral case. We don't have any choice to reverse the Second Circuit or disagree with the Second Circuit on this case. I agree, Judge Niemeyer. And let me make one other point, is that Mr. Page conceded below, in this case, in the District Court that the documents at issue, the ones that we're fighting about today, should have been produced in the Southern District of New York pursuant to Judge Kaplan's discovery orders and pursuant to Judge Kaplan's waiver orders. So the documents we're fighting about today, they have conceded should have been produced pursuant to a federal court order. That's undisputed on this record. What they are doing, Your Honors, is they are playing a shell game. When we went to Mr. Donziger and said, produce your documents, he said, well, I've given you the documents I have. And we said, well, that's not good enough. You also are required, under Rule 45 and Judge Kaplan's express order, to produce documents within your control. And that necessarily encompasses documents possessed by your associates, your law interns and the like. That's what Judge Kaplan held. Straightforward black letter law. That encompasses Mr. Page. Mr. Page... Let me ask about the, not the 2nd Circuit opinion that was the subject of the D.C. Circuit opinion, the specific discovery issue that's related to the waiver. When that went up to the 2nd Circuit, were any of the alternative grounds that the Magistrate and the District Court reached in this case, dealing with the crime fraud exception, the disclosure to third parties and the disclosure through the Ecuadorian courts, were any of those part of that case? No, Your Honor. I think it's fair to say that the 2nd Circuit's ruling focused on the privilege waiver question. Judge Day's additional reasons for granting our discovery requests, namely the crime fraud exception and the disclosure to third parties, are independent, sufficient grounds for affirming the judgment below. The privilege waiver question, if this Court affirms on privilege waiver, that's the end. In other words, affirming the privilege waiver, which we think is very straightforward... What privilege waiver are we talking about? Both? What privileges? We're talking about Judge Kaplan's finding that both attorney-client and work-product had been waived by Donziger's misconduct. All privileges claimed were waived? Yes. And you say that ruling was affirmed by the 2nd Circuit? Yes. And what's the explanation for the D.C. Circuit relying on the Salazar appeal? The D.C. Circuit in the Weinberg case, what happened in that case was the magistrate judge in D.C. had conducted what at least in the judgment of the D.C. Circuit was not a sufficiently independent determination as to crime fraud. In other words, again, in the judgment of the D.C. Circuit, the magistrate judge had simply said I'm going to look at what Judge Francis, which was the magistrate judge in New York, found, and I'm not going to conduct an independent inquiry of the record before us. That is the polar opposite of this case, and Judge King that gets to your question as to why the Weinberg decision has little to say. What distinguishes this case is that in this case, Judge Day did conduct an independent analysis. As the court knows... Did he look at the documents? Well, he didn't look at the He didn't look at the ones you're fighting about. That's what we were told just a moment ago. That's what I said. He didn't look at the documents. And he didn't look at them individually and try to figure out is this protected or not protected by first of all, attorney-client privilege and second of all, work-product privilege? He did not do that. He did not do a document-by-document review of the documents we're fighting about. He was not required to. This court has said that courts, district courts, have wide discretion to decide whether or not to conduct that sort of review. And we think Judge Day acted well within his broad discretion in declining to do the exhaustive document-by-document march that the plaintiffs have demanded. But what Judge Day did do and again, this goes to why it's different from the D.C. Circuit case, is that Judge Day did conduct his own independent evaluation of the record evidence. In his two opinions in this case, he talked at length about the evidence of fraud, specifically the evidence that Mr. Page played a key role in ghostwriting the fraudulent and corrupt Ecuadorian judgment. Mr. Page wrote the so-called fusion memo which was a legal document that was incorporated, essentially word for word, into the fraudulent Ecuadorian judgment. Judge Kaplan's 500-page opinion explains this in painstaking, exhaustive detail. That's right, Judge King. In exhaustive detail how this fraud was perpetrated. Judge Niemeyer, you put your finger on it. This was a wide-ranging sweeping fraud that involved the intimidation of judges, the fabrication of expert reports, the ghostwriting of judicial opinions, bribery, corruption. It ran the gamut. But in the D.C. Circuit District Court opinion that went up to the D.C. Court of Appeals, the only issue there was the crime fraud exception. Is that right? Yes. So there's no other waiver issues were involved there that are also involved in this case? The D.C. Circuit declined and worked fraud up. The D.C. Circuit focused on the crime fraud issue. And again, distinguishable on several grounds. One is that in our case, the judge did conduct an independent examination. That was an alternative to the crime fraud, wasn't it? Wasn't that the alternative he talks about here? Judge Day, Your Honor? No, the D.C. Circuit, the District Court added in the alternative that even if it was an open one, the evidence marshal more than sufficiently made out a prima facie case of fraud on the Ecuadorian court. That was the alternative ruling and the judge, the court, the panel, reversed that. Said it's not clear at all that the D.C. Court applied the crime fraud test set forth in this court's cases. And that is the difference between that case and this case? That was the alternative ruling that they used. That was an alternative ruling that the D.C. Court rejected. Well, I don't understand your answer then to my question. In the D.C. case, were the other waiver issues, the derivative waiver from Mr. Donziger occasioned by the filing of the late disclosure law, the third party disclosure, were any of those issues in the D.C. case? No, it was crime fraud. Okay. So, let me make one other point as to why the D.C. Circuit case is distinguishable. At the time the D.C. Circuit case came down, the Judge Francis opinion, and that's the one that the D.C. Circuit said the magistrate judge had improperly placed too heavy reliance on, had arguably been called into question by the intervening Second Circuit decision. Again, the Naranjo decision, not the waiver affirmance we've been talking about. Since that time... What was holding the Second Circuit in that case? The Second Circuit basically said that the relief that we were seeking wasn't available. They said it was a procedural question about the sort of relief that you could obtain under New York's Judgment Recognition Act. So, again, it didn't get into the fraud, and in fact... Was that a disjunction request? So, it basically was. It was a count as a declaratory judgment request. That was the so-called Count 9 issue. That went up to the Second Circuit. The Second Circuit sent the case back, but, and this is the key point, at the end of the decision, they said, we're not opining on any of the crime, fraud, or any of those issues. And so, I don't think that... Something about these issues about the waiver ought to be reevaluated or something, too. Well, again, that's the waiver decision, Judge King. That wasn't the declaratory judgment ruling. What they said in the waiver ruling is they said that in the event that Ecuador or the others able to buy more time, in other words, the reason why we were hustling in the Southern District of New York is because we had imminent court deadlines, including criminal prosecutions and the like, and so we needed these documents in a hurry. The Second Circuit basically said if that situation changes, namely if Ecuador and the plaintiffs were able to obtain extensions in those cases, so there wasn't the time urgency that maybe Judge Kaplan would go back and look at some of these issues. Of course, they didn't do that. They never came back. And so, that's all it was. The Second Circuit most certainly did not call into question Judge Kaplan's judgment or suggest that he should have done anything differently. I think what this case ultimately boils down to as far as the waiver issue goes, again, first principle is that they have conceded these documents should have been produced already in the Southern District of New York. What they are basically arguing today, and I don't think it's a tenable position, is that the fact that Mr. Donziger, who is effectively the partner in this structure with Mr. Page being his law intern or his associate, that Mr. Donziger is not required to turn over documents or that they may be withheld if they happen to be in the possession of the associate or the law intern. That's obviously not the law. That's a recipe for shell games. It's a recipe for misdirection. If a partner is under an order to produce documents, that partner cannot walk down the hall and give to his associate or his intern the file and say, I don't have to produce it. These documents should have been produced. They concede they should already have been turned over pursuant to Kaplan's orders. So we are fighting over documents that they agree should already have been turned over to us. Let me also quickly, in my remaining time, speak... We're arguing about documents that you already have. We have most of them, Judge King. Mr. Terrell suggested... We don't have all of them. I understood you did have all of them. It's a question whether you keep them or give them back or something. We have documents that Mr. Page has produced. Mr. Terrell said he thought it was a few hundred pages. That's wrong. It's, I think, north of 9,000 pages. But the other point where Mr. Terrell was incorrect is where he said... 9,000? Yes, more than. The other point where Mr. Terrell may have misspoke is when he suggested that they had fully complied with the order. That's not true. In fact, we have a pending contempt hearing against Mr. Page scheduled in the District of Maryland. We've moved for contempt sanctions. Which case is that in? That is actually both the RICO case and the 1782 case. Can you have hearings when it's on appeal? I think you can as long as the District Judge is not modifying the substance of the remedy he's given. It was in aid of an appeal. Only. The 1782 order is a final judgment. You can't be having a hearing if it's a final judgment. It's over with. It's a final judgment for purposes of appeal. That doesn't necessarily mean all the proceedings in the District Court stop. In other words, if the District Court orders production in certain circumstances, at least in the 1782 context, courts have said that can be appealed as the final order, notwithstanding that there's more fighting going on over the scope of compliance. Are you still litigating up there? Did Donziger turn over these documents in New York? No, Judge Niemeyer. Donziger did not. He turned over some of the documents that we think are in Mr. Page's possession, but he did not give us the documents that we sought and that Mr. Page ultimately did turn over. It turned out they were in his possession all along. I think that's it. Are there further questions? There's a red light and you get a ticket going through, you know. I'll sit down at this point, Your Honor. Thank you very much. Your Honor, there's been so many Circuit Court opinions in this case, it's tough to keep them straight, but let me try to be sure that confusion that I think that just occurred is straightened out. There was a 1782 against Mr. Donziger in New York. That was the case in which   and that was the case in which he allegedly did not put in his privilege log in time and in which there was an overall forfeiture of 17 years of attorney-client information. That went up to the Second Circuit. The Second Circuit ultimately stated and ultimately said there's only one justification for this draconian remedy and that is the imminence of criminal proceedings against two of Chevron's lawyers and on that limited basis alone, we will allow the discovery to go forward, the forfeiture to go forward. That was the issue. However, we say to the District Court if that emergency changes, we suggest that the District Court go back and reconsider this draconian result. Judge Kaplan, to encourage that in the meantime, entered another opinion before the Second Circuit ruled and while we were arguing, saying I'm open to that. Then it went back to him and he said, you know what? I'm not open to it. I'm not going to reconsider it. That forfeiture of 17 years of privilege, work product and attorney-client is absolute. That's where it stands. Now, how is that relevant? Has that been reviewed by the Second Circuit? The Second Circuit affirmed that and that was the opinion I just referred to and said, but go back and look at it again if the emergency goes away. The emergency did not went away and he didn't do it. He refused to do it. Did that go back up again? I don't think so. Whatever the scope of that is, and we may have to look at it closely, but whatever the scope of that is, it seems to me, as an ancillary proceeding here in Maryland, we have no freedom to reverse the law of the case. But that's why I'm trying to straighten out the confusion. That order did not occur in the proceeding in which your ancillary proceeding came from. That was the 1782. Alright, what happened in the RICO? In the RICO, and that's where your question is directly relevant. That's why I'm trying to straighten them out. In the RICO case, in which your ancillary proceeding occurred as to the subpoena, not the 1782, that was completely dismissed by the Second Circuit. That led to the decision Judge King... That was the Salazar case. That was the Salazar case. I want you to assume that we also have the RICO case that was just decided by Judge Kaplan. That this subpoena is in that case. If this subpoena, just take this as a hypothetical, if this subpoena issued out of the RICO case, what's the status of it in New York? If the subpoena issued out of the RICO case, which of course we contest, at that point in time, there is a question of whether or not there is, I guess, appellate jurisdiction over the subpoena here, which goes back to the Perlman issue that we discussed. Alright, that's one issue. But if we get over that issue, what do we do? I mean, we're subservient. This is not our case. If the RICO case, if this is an adjunct to the RICO case, it is a Southern District of New York case that is supervised by the Second Circuit. And we have, we supervise the Rule 45. But we're stuck with the law of the case. Your Honor, if I may, you've pushed me on this, but let me respectfully push back. The subpoena here that does bear the number, at the time it was both cases shared one number, before it got a different number, that subpoena was issued in the case that the Salazar case, the Count 9 case, because the timing makes it absolutely clear. The timing, as I understand it, was the order for bifurcation was issued, the subpoena issued, after that, but the effect of the bifurcation did not take place yet. There was no docket number. There's a later docket number given to the Salazar case. At the same order that Judge Kaplan ordered the bifurcation, he ordered a stay of the RICO action. There could have been no discovery in the RICO action by Judge Kaplan's own order at the time the subpoena issued out. That's the law of the case, too, and that could be challenged. In other words, the subpoena could be motion, could be subject to a motion to quash based on the fact that the discovery stayed, but that doesn't make the subpoena any less effective. You said it just couldn't have happened. Well, it did happen. But here's what happened. All of this went our way. Judge Titus and Judge stayed all discovery in the case, entered an administrative order closing the motion to compel. It was over. He then entered an order to return the documents to us and then somehow, magically, a year and a half later, he opened it up again and entered another order that basically led to the direction that the documents be produced. Now, I think there was confusion. Wasn't the stay lifted in the RICO case? The stay was lifted in the RICO case, but they'd served another subpoena in the RICO case, which is just dropped. I know, but that means there's still two. The first one doesn't go away. It was just stayed. The first one does not go away. It was just stayed, but it goes away if the predicate action to which it was ancillary is dead. Well, that's the question I ask. If it's a RICO case, the question, is it dead? I don't know the answer to that. If it is the RICO case, the RICO case was stayed, so it wasn't dead in New York. But all of the things happened in the Salazar case, and then Judge Titus reopened it a year and a half later after he'd already ordered the documents returned. I understand, but you're not following through in the RICO case. I'm assuming this is in the RICO case. In the RICO case, there was a stay. Then the stay was lifted in the RICO case. Both by Judge Titus and in New York. Forget Titus. We're talking about New York. What happened after that? Then Judge Kaplan issued his big opinion. A long time later, yes. A long time later. After the stay was lifted, if the subpoena was attached, the subpoena's legit then, right? If the subpoena was attached, the subpoena is legitimate, and there's probably no appellate jurisdiction for that here. But of course, there is appellate jurisdiction under 1782. Well, I understand that's another issue. It's a procedural mess. The bottom line I think we agree on that. We'll stipulate. You've been most generous. Your bottom line position on the RICO case, as I understand it, is that the subpoena was totally segregated toward this count 9, the New York enforcement of foreign money judgment actions. When that went away, the subpoena, there was no more power left in the subpoena. And that's how Judge Titus behaved. He basically entered a stay. He then ordered the motion to compel administratively dismissed. We moved to have the documents returned. He ordered that they be returned. They never were returned. Did he rule on the dismissal or administrative dismissal, you called it? He administratively froze or dismissed the motion to compel. It went away. In a year or more, it went away. Then he reopens the case. Was that done before or after the stay was lifted in New York on the other 8 counts of the RICO case? After the stay was lifted in New York on the other 8 counts of the RICO case. Did Judge Titus have both cases in one case 1782 and the New York case? Yeah, he had them at the same time. How did he stay? How did he close the 1782 case? Because there was a final ruling in the 1782 case to produce documents and then we appealed. So there had been objections to the magistrate's order directing that documents be produced in 1782. Importantly, in the 1782 case, the procedure you follow is you ask permission to serve a subpoena, then you serve the subpoena. The Judge Day collapsed it all. You know that. So there was no time to do anything. He just triggered the order and said you've got to produce the same documents. But once he ordered that, then months later Judge Titus affirmed that and then we appealed. So there's clearly appellate jurisdiction over that. In any event, there was no document by document review. Did this make a legitimate law school examination to sort out procedures on this? Rule 45 exam. Yes, Your Honor. It probably would. And I hate to say, if I only had the resources, 2% of the resources my friends at Chevron did, it's much ado about nothing. Not that it isn't important and that we're here. But if it's remanded and they look at, if I'm in error and it's 9,000 documents, in a case that's had tens of millions of documents produced, they know they're 9,000 documents. They could say give me this one or that one and we'd probably say we give it to you. They want a wholesale crime fraud determination that they can offer to courts and say look at this. Now the Fourth Circuit went this way. The District of Maryland went this way. ...
judges: Paul V. Niemeyer, Robert B. King, G. Steven Agee